UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

KEVIN BIRDO,
    Plaintiff,

vs.     06-3055

LOWELL BROWN, et al.,
    Defendants.

### MEMORANDUM OPINION AND ORDER

    Before the court are the defendants, C Shaw, S Moore, Wexford Health Services, Inc, Lowell Brown, Funk's summary judgment motion [109], the plaintiff's response [147], the defendants' reply [130], the defendants, Sue Redshaw, Gary Drawve, Jackie Miller, Terry Polk, Roger E Walker's summary judgment motion [110], the plaintiff's. response [124] the defendants' reply [125], the defendant, Deborah Fuqua's summary judgment motion [135], the plaintiff's response [146] and the defendants' reply [143]. This is a case under 42 U.S.C. § 1983 by an inmate of the Illinois Department of Corrections, Kevin Birdo, claiming that the defendants were deliberately indifferent to his serious medical need in violation of the Eighth Amendment to the United States Constitution.

    On October 12, 2004, while Birdo was incarcerated at Western Illinois Correctional Center, the plaintiff broke his arm. He was taken to the health care unit at Western where x-rays confirmed the fracture. Three or four hours later, Birdo was transferred to Blessing Hospital in Quincy, Illinois where his fracture was treated. Later Birdo went back and forth from Western to orthopedic specialists in Quincy and Mt. Sterling a number of times until he was finally discharged as recovered. Birdo complains of the treatment given to him, the medications prescribed and withheld, and the results of the procedures employed.

    He sued everyone connected directly or indirectly to his medical episode -- Lowell Brown, M.D., Arthur Funk, M.D., Wexford Health Sources, Inc., Gary Drawve, Jackie Miller, Terry Polk, Sue Redshaw, Deborah Fuqua, Roger E. Walker, Jr., Connie Shaw, Susan Moore, Craig Olson, M.D., Stephen Morton, M.D., Mt. Sterling Orthopedic Clinic and Blessing Hospital. The last six named defendants have been dismissed by the court earlier in the proceedings.

**Standard**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 17, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

In support of their motions for summary judgment, the defendants have filed detailed statements of fact supported by reference to depositions and medical records. The plaintiff, on the other hand, in his responses to the motions, has offered in rebuttal mostly only his personal conclusory and immaterial assertions. He has not offered evidence that tends to show the existence of genuine issues of material fact. Further, although the plaintiff is familiar with the local rules, he did not comply with United States District Court Local Rule 7.1(D). With few exceptions, the court adopts the defendants' statements of uncontested facts as uncontested facts in the case together with the exhibits presented in support of their motions.

**Uncontested Material Facts**[1]

1. Plaintiff was incarcerated at the time he filed his cause of action against the Defendants. (See Document No. 14, p. 1, par. 3.)
2. At that time, Plaintiff was incarcerated at the Western Illinois Correctional Center. (Document No. 14, p. 1, par. 3.)
3. Group Exhibit B-1 is an exact copy of the medical records obtained from the Quincy Medical Group. (See Affidavit of Kimberly L. Richardson, Group Exhibit B-1, p. 1.)
4. Mr. Birdo is currently incarcerated at the Lawrence Correctional Center. (Birdo Deposition, p. 7.)
5. Mr. Birdo is not medically unassigned. (Birdo Deposition, p. 7.)
6. Mr. Birdo does not have a job presently because he is in segregation. (Birdo Deposition, p. 8.)
7. Mr. Birdo was in segregation at the time the defendants took his deposition on June 6, 2007. (Birdo Deposition, p. 8.)
8. Mr. Birdo agrees that the medical need referenced in his Complaint refers to a fractured left arm, which occurred on October 12, 2004. (Birdo Deposition, p. 10.)
9. Mr. Birdo was sent to the Blessing Hospital in Quincy, Illinois on October 12, 2004. (Birdo Deposition, p. 10.)
10. Mr. Birdo was seen by a physician at Blessing Hospital on the date that he fractured his arm. (Birdo Deposition, p. 10.)
11. The physicians at Blessing Hospital treated Mr. Birdo and sent him back to the Western Illinois Correctional Center on the same date. (Birdo Deposition, p. 10.)
12. Mr. Birdo was returned to the Western Illinois Correctional Center with a shoulder immobilizer. (Birdo Deposition, p. 12.
13. This immobilizer remained on his left arm until October 22, 2004. (Birdo Deposition, p. 11.)
14. Subsequent to October 22, 2004, Mr. Birdo saw an orthopedic physician on November 9, 2004 and again on January 11, 2005. (Birdo Deposition, pp. 12-13.)
15. Mr. Birdo did not see Dr. Funk after he fractured his arm on October 12, 2004. (Birdo Deposition, p. 15.)
16. Dr. Funk never personally evaluated Mr. Birdo's fractured arm. (Birdo Deposition, p. 15.)17.
17. Mr. Birdo's claim against Dr. Funk alleges that Dr. Funk somehow delayed his treatment. (Birdo Deposition, pp. 15-16.)
18. Mr. Birdo believes that Dr. Funk failed to respond to a referral request. (Birdo Deposition, p. 17.)
19. However, Plaintiff admits that he has no documentation to indicate that a request for a referral to an outside provider was denied at any time by Dr. Funk. (Birdo Deposition, p. 18.)

---

[1] Exhibits can be found at defendants' summary judgment motion [109] defendants' memorandum of law [111], except as otherwise noted.

20. Mr. Birdo alleges that Connie Shaw failed to provide him with Hydrocodone on October 20, 2004. (Birdo Deposition, p. 18.)
21. Mr. Birdo admits that the only date upon which he is complaining that Ms. Shaw failed to provide him with Hydrocodone is October 20, 2004. (Birdo Deposition, p. 22.)
22. Mr. Birdo is also claiming that Nurse Shaw refused to provide him with Robaxin. (Birdo Deposition, pp. 22-23.)
23. Plaintiff also claims that part of his case relates to a failure to assist him with bathing or keeping adequate hygiene. (Birdo Deposition, p. 24.)
24. Mr. Birdo agrees that his claims against Nurse Moore are similar to those made against Nurse Shaw.
25. Mr. Birdo agrees that his complaints against Nurse Moore concerning her failure to provide him with Hydrocodone relate to October 21, 2004. (Birdo Deposition, p. 25.)
26. Plaintiff also alleges that Nurse Moore failed to provide him with Robaxin on that date. (Birdo Deposition, pp. 25-26.)
27. With respect to Dr. Brown, Plaintiff claims Dr. Brown should have provided him with effective medication for pain. (Birdo Deposition, p. 28.)
28. Plaintiff also claims that Dr. Brown unnecessarily delayed emergency medical care for ten (10) days. (Birdo Deposition, p. 28.)
29. Plaintiff claims that Dr. Brown denied him patient support and education. (Birdo Deposition, p. 28.)
30. Plaintiff also claims that Dr. Brown sat idly by and condoned actions of his fellow Defendants. (Birdo Deposition, p. 28.)
31. Where Mr. Birdo references unnecessary delay, he is referencing the ten (10) days between the date of his fracture, October 12, 2004, and the date that he was returned to see Dr. Morton on October 22, 2004. (Birdo Deposition, p. 29.)
32. Plaintiff does not know how many Tylenol he took. (Birdo Deposition, p. 30.)
33. Plaintiff does not know whether he took all the Tylenol that was offered to him. (Birdo Deposition, pp. 30-31.)
34. Plaintiff claims that Dr. Brown should have ordered an MRI of his arm. (Birdo Deposition, pp. 34-35.)
35. No one has ever advised Mr. Birdo that his bone is not healed. (Birdo Deposition, p. 48.)
36. No one has placed any restrictions on his physical abilities to move his left arm. (Birdo Deposition, p. 48.)
37. The current physician at the Lawrence Correctional Center, Dr. Loftin, has not told him not to do any specific movements. (Birdo Deposition, pp. 48-49.)
38. In the course of his practice as the Medical Director at the Western Illinois Correctional Center, Dr. Brown saw a patient by the name of Kevin Birdo. (Exhibit A.)
39. The medical records suggest that Mr. Birdo was transferred to the Western Illinois Correctional Center on approximately May 5, 2004. (Exhibits A and A-1.)
40. Subsequent to that date, Plaintiff's records reflect that he injured his left arm on Oct. 12, 2004. (Exhibits A and A-2.)
41. The X-ray films taken on October 12, 2004 reflected a displaced, elongated fracture of the humeral shaft. (Exhibits A and A-4.)
42. Nurse Practitioner Rhonda Mills contacted Dr. Olson, an orthopedist, and wrote an order

43. The radiology report from October 12, 2004 reflects that Mr. Birdo suffered from a fracture of his left humerus through the distal shaft with partial displacement and mild angular deformity. (Exhibits A and A-6.)
44. The records further reflect that Mr. Birdo was sent outside of the Western Illinois Correctional Center on a medical furlough to Blessing Hospital's emergency room in Quincy, Illinois on October 12, 2004. (Exhibits A and A-3.)
45. The record of October 12, 2004 reflects that Mr. Birdo was sent out at approximately 3:50 p.m. to Blessing Hospital. (Exhibits A and A-3.)
46. Mr. Birdo returned from Blessing Hospital at approximately 9:25 p.m. to the infirmary for a twenty-three (23)-hour observation. (Exhibits A and A-3.)
47. A nurse noted that Mr. Birdo had a sugar tong splint placed on his left arm. (Exhibits A and A-3.) Surgery might have been a possible option on October 12, 2008, however, Exhibit A documents that plaintiff did not want surgery on October 12, 2008 and reflects that Dr. Morton agreed with a conservative course of care on this date. There is nothing within Exhibit A to suggest that surgery should have or would have ben an option on October 14, 2004 or that such was medically necessary. *See* plaintiff's exhibit A [147].
48. The records received from Blessing Hospital reflect that a physician affiliated with Blessing Hospital recommended ice for Mr. Birdo's left arm; placed a shoulder immobilizer on the left arm; requested that Mr. Birdo maintain a sugar tong splint, and that he should follow up with Dr. Morton on Wednesday, Thursday, or Friday, and to call for an appointment. This physician recommended a pain medication, Hydrocodone, as needed for pain, as well as Robaxin for muscle spasms. (Exhibits A and A-7.)
49. In conjunction with this order, the nurse contacted Dr. Larson and notified him of the recommendations made by the doctor at Blessing, presumably Dr. Morton. (Exhibits A and A-3.)
50. The note further reflects that at 10:30 p.m., Dr. Larson (a physician) was notified of Mr. Birdo's return and that he provided orders as follows: splint to remain on until doctor's appointment with Dr. Morton, Quincy Medical Group, on Wednesday, Thursday, or Friday (whichever date is convenient). Diet as tolerated. 23-hour infirmary admission. Vicodin 5/500 one or two orally every 4 hours as needed for 24 hours. Robaxin 750 mg every 8 hours for 24 hours only for severe muscle spasms. Telephone order of Dr. Larson. (Exhibits A and A-3.)
51. Dr. Larson's orders were consistent with those suggested by Dr. Morton. The records reflect that the inmate (Mr. Birdo) refused the ice to the left arm. (Exhibits A and A-3.)
52. Dr. Larson's order of Vicodin is an acceptable substitute for Hydrocodone. (Exhibit A.)
53. It should be noted that there were no complaints of severe muscle spasms made by Plaintiff nor observed by medical staff during the twenty-four (24) hours the Robaxin prescription was in effect. Accordingly, there was no medical indication for administering or continuing the order for Robaxin. (Exhibit A.)
54. In addition, Mr. Birdo was receiving Vicodin during the time the Robaxin script was in effect. The Vicodin apparently was sufficient. (Exhibit A.)
55. During Mr. Birdo's hospitalization, he received morphine for his complaints of pain.

   (Exhibits A and A-8.)
56. Once Mr. Birdo's immobilizer was in place and he was returned to the correctional center, morphine was no longer indicated. (Exhibit A.)
57. In Dr. Brown' opinion, the orders for care made by Dr. Larson were reasonable and appropriate. (Exhibit A.)
58. The X-ray taken at Blessing Hospital in Quincy, Illinois reflects a similar finding to the X-ray taken at the correctional center. Both radiology reports reflect a displaced fracture of the left humerus. (Exhibits A and A-9.)
59. The records reflect that an attempt was made to schedule an appointment with the orthopedic physician for October 15, 2004. However, this appointment was postponed because Dr. Morton's office (the orthopedic physician) called the correctional facility to advise that he did not have the needed splint and would not have it by October 15, 2004. An appointment was therefore rescheduled for October 22, 2004. (Exhibits A and A-10.) Plaintiff's Medical Progress Notes of October 15, 2004, attached hereto as Exhibit H [111])
60. It appears that Dr. Brown did not see Mr. Birdo personally until October 18, 2004. (Exhibits A and A-11.)
61. At that time, Dr. Brown's note reflects the following:
  S (subjective): L (left) humerus.
  O (objective): Oblique fracture in a splint. Asking for narcotics.
  A (assessment): Fracture L (left) humerus, closed.
  P (plan): I will speak with ortho. DC (discontinue) Vicodin; add Tylenol.
(Exhibits A and A-11.)
62. On October 18, 2004, Dr. Brown saw Mr. Birdo for his subjective complaints relating to his left humerus. At that time, Dr. Brown noted objectively that the patient had his left arm in a splint. He was asking for narcotics. Mr. Birdo's left humerus fracture was closed. Dr. Brown's plan was to speak with the orthopedic physicians treating Mr. Birdo. Dr. Brown discontinued his Vicodin as the order for this medication expired. He ordered Tylenol to treat Mr. Birdo's complaints of pain. (Exhibit A.)
63. In Dr. Brown's medical opinion, seven (7) days was a more than adequate length of time for Mr. Birdo to receive the Vicodin, a narcotic medication. In Dr. Brown's medical opinion, Tylenol or a similar substitute such as Motrin was an appropriate step down from the Vicodin. (Exhibits A and A-11.)
64. Dr. Brown saw Mr. Birdo again on October 19, 2004 at 8 a.m. His note from that date reflects the following:
  S (subjective): The left arm fracture. Dr. Morton wants to see within the next week for definitive splinting.
  O (objective): Temporary splinting.
  A (assessment): Fractured shaft of humerus, distal.
  P (plan): Dr. Funk approved visit. (Exhibits A and A-11.)
65. The next time Dr. Brown saw Mr. Birdo was on October 19, 2004. At that time, Dr. Brown noted that Dr. Morton, the orthopod, wanted to see Mr. Birdo within the next week for permanent splinting of his arm. Dr. Brown obtained approval from Dr. Funk, the Regional Medical Director, for this outside medical furlough. Dr. Brown

6

appropriately requested the referral and Dr. Funk approved the visit.  (Exhibits A and A-11.)
66. Dr. Brown ordered Motrin for Mr. Birdo.  (Exhibits A and A-34.)
67. Dr. Brown next saw Mr. Birdo personally on October 20, 2004.  At that time, Mr. Birdo was complaining of pain.  He was "vociferous about analgesics, especially the opioids."  (Exhibits A and A-12.)
68. At that time, Dr. Brown observed Mr. Birdo suffered from a fracture which had been splinted.  Mr. Birdo was scheduled to be seen by Dr. Morton.  Dr. Brown did not modify his orders regarding pain medications at that time.  (Exhibit A.)
69. In Dr. Brown's opinion, the step down from the narcotic to the Tylenol and/or Motrin was appropriate as long-term use of narcotics can be addictive and could result in negative side effects.  In addition, this strength of pain reliever was no longer medically indicated. (Exhibit A.)
70. Dr. Brown next made a note in Mr. Birdo's chart on October 21, 2004.  He does not believe he saw Mr. Birdo on that date, but noted that he would be sent out to an orthopedic physician for further evaluation.  (Exhibits A and A-13.)
71. On October 22, 2004, Dr. Brown prepared the discharge summary from the healthcare unit prior to Mr. Birdo being sent out for further evaluation.  (Exhibits A and A-14.)
72. Mr. Birdo was seen by Dr. Steven Morton on October 22, 2004.  Dr. Morton saw Mr. Birdo for fracture bracing on that date.  (Exhibits A and A-15, pp. 1-2.)
73. According to Dr. Morton's report, Mr. Birdo received a fracture brace.  According to Morton's report following placement of the brace, the X-ray revealed excellent alignment.  (Exhibits A and A-15, p. 2.)
74. Dr. Morton requested that Mr. Birdo follow up with him in approximately two (2) weeks.  During that time, Mr. Birdo was to maintain the fracture brace.  (Exhibits A and A-15, p. 2.)
75. Mr. Birdo maintained his fracture brace and was scheduled for a follow-up visit.  (Exhibit A.)
76. On November 9, 2004, Mr. Birdo was sent out for his two-week follow-up with the Quincy Medical Group.  (Exhibits A and A-16.)
77. At that time, the orthopedic physician's findings were that Mr. Birdo was doing well.  He was to follow up in six (6) weeks. He was to continue to wear his sling.  There was no evidence of an elbow fracture. Plaintiff was to let gravity pull on the fracture.  (Exhibits A and A-16.)
78. Pursuant to Dr. Olson's request, the patient was seen again by him on December 14, 2004 for a follow-up visit. (Exhibits A and A-17.)
79. Dr. Brown's next entry in Mr. Birdo's medical records is dated December 14, 2004.  At that time, Dr. Brown noted that Dr. Olson said he may splint the patient loosely as a reminder.  He noted healing was seen on the X-ray.  The patient was scheduled to see the orthopedic physician in two (2) months for follow-up.  At that time, Dr. Brown ordered a low bunk for Mr. Birdo for one (1) month.  (Exhibits A and A-18.)
80. On December 17, 2004, Mr. Birdo was seen by Nurse Barb Bower.  At that time, he complained that his arm was weak.  He requested physical therapy.  Nurse Bower encouraged Mr. Birdo to use his arm and to exercise without weights.  Nurse Bower

scheduled a follow-up visit with her for December 21, 2004. (Exhibits A and A-19.)
81. Dr. Brown next personally saw Mr. Birdo on December 21, 2004. At that time, Mr. Birdo complained that his left arm had little or no power in his muscles. On examination, the patient's efforts reflected that his biceps and triceps were almost powerless. His deltoid and forearm were good. Sensory was intact. Dr. Brown assessed that Mr. Birdo had atrophy due to not using his arm. Dr. Brown's plan at that time was to have Mr. Birdo participate in self-regulated therapy. He was to see Dr. Olson in January of 2005. (Exhibits A and A-20.)
82. Mr. Birdo saw Dr. Olson on January 11, 2005. The X-ray taken on that date reflected that the bone had healed nicely and that the fracture was barely seen. Dr. Olson's record notes that "alignment is excellent." (Exhibits A and A-21.)
83. On January 11, 2005, Mr. Birdo was seen by Dr. Olson. Upon return from his visit, Dr. Brown spoke with Mr. Birdo, who advised Dr. Brown that Dr. Olson "wants an MRI to assess biceps and triceps." On personal examination, Dr. Brown observed that the patient needed passive help to raise his left arm. He had good sensory responses and a good grip. The bone was healed. Dr. Brown's assessment at that time was myopathy of the left upper limb. His plan was to provide Mr. Birdo with a low bunk through March 15, 2005. Dr. Brown also planned to discuss the patient's status with Dr. Funk, the Regional Medical Director. Dr. Brown prescribed Tylenol for Mr. Birdo's complaints of pain. (Exhibits A and A-22.)
84. Dr. Olson's note reflected that Mr. Birdo had requested an MRI, as the note reflects that "he thinks that will help." (Exhibits A and A-21.)
85. Dr. Olson's note indicated that an MRI could clarify the patient's diagnosis with respect to the patient's complaints of pain; however, Dr. Olson's note specifically indicated that he did not believe the MRI would change the outcome and if the MRI suggested damage, there would not be any surgical treatment recommended. (Exhibits A and A-21.)
86. Dr. Olson left the decision as to whether or not an MRI would be performed up to Dr. Brown. Dr. Olson indicated that Mr. Birdo could do independent exercises and would need to follow up only as needed. (Exhibits A and A-21.)
87. This typewritten note was received at Western Illinois Correctional Center on January 24, 2005. (Exhibits A and A-21.)
88. Dr. Brown personally reviewed this document on January 25, 2005. (Exhibits A and A-21.)
89. After reviewing Dr. Olson's complete note, Dr. Brown came to the conclusion that an MRI was not medically necessary as Dr. Olson himself indicated that the results of the MRI would not change the outcome and surgery would not be recommended even if the MRI reflected damage to the muscle. (Exhibit A.)
90. As there was no indication that Mr. Birdo suffered any further complications or problems relating to his bone, no further follow-up visits were deemed necessary with the orthopedic physician. (Exhibit A.)
91. Subsequent to reviewing Dr. Olson's typewritten note from January 11, 2005, received on January 24, 2005, and reviewed by Dr. Brown on January 25, 2005, Dr. Brown did not recommend that an MRI be obtained. As noted above, Dr. Olson's note does not suggest that an MRI is medically necessary. Based upon Dr. Brown's review of these medical

8

records, it appears that he may not have communicated with Dr. Funk regarding the issue of an MRI as he would have determined on his own that such a procedure was not medically necessary. (Exhibit A.)

92. Dr. Brown has no written documentation which indicates that he completed a request for referral to have an MRI completed. He did not order an MRI. (Exhibit A.)
93. In Dr. Brown's opinion, an MRI was not needed at that time, nor was one indicated at any time he saw Mr. Birdo while he was incarcerated at the Western Illinois Correctional Center. (Exhibit A.)
94. On February 23, 2005, Mr. Birdo was seen by a nurse. At that time, Mr. Birdo complained that he was still having problems with his left arm. Mr. Birdo was assessed by the nurse, who found no deformity in the left arm. (Exhibits A and A-23.)
95. Dr. Brown saw Mr. Birdo on February 25, 2005, regarding his complaints of pain in his left arm. On examination, Mr. Birdo's biceps were of decent size and strength. His triceps appeared weak and atrophic. Dr. Brown's plan at that time was to work on tricep-strengthening. (Exhibits A and A-24.)
96. Mr. Birdo went on a hunger strike in March of 2005 in protest of not receiving his MRI. (Exhibits A and A-25.)
97. Mr. Birdo was admitted to the infirmary for his hunger strike on March 19, 2005. (Exhibits A and A-25.)
98. On March 22, 2005, Dr. Brown saw Mr. Birdo, who refused any form of cooperation. Dr. Brown instructed Mr. Birdo to use his upper arm in whatever activities he could think of. Dr. Brown showed Mr. Birdo some examples of these arm exercises. (Exhibits A and A-26.)
99. Mr. Birdo continued to complain about his request for an MRI. His medical record reflects that on March 24, 2005, the Healthcare Unit Administrator spoke with Mr. Birdo's family regarding the MRI and that there were no orders for such a procedure. (Exhibits A and A-27.)
100. As stated above herein, in Dr. Brown's opinion, Mr. Birdo is not in need of an MRI. Such a procedure is not medically necessary as it would not change the care and treatment being provided to Mr. Birdo. (Exhibit A.)
101. Dr. Brown documented this again on March 28, 2005. (Exhibits A and A-28.)
102. Dr. Brown advised Mr. Birdo himself that an MRI was not required. On that date, Mr. Birdo was discharged from the infirmary following the conclusion of his hunger strike. (Exhibits A and A-28.)
103. As the Medical Director, it is Dr. Brown's decision as to whether or not a particular medical procedure is deemed medically necessary. (Exhibit A.)
104. Dr. Brown is aware, through this lawsuit, that Mr. Birdo made complaints to others regarding his request for an MRI. Those individuals, including Deborah Fuqua, the Healthcare Unit Administrator, and/or correctional officers, would not be in a position to order an MRI without Dr. Brown's approval. There was no reason for Dr. Brown to discuss the MRI issue with Deborah Fuqua or the correctional officers. If any of them would have asked Dr. Brown about Mr. Birdo's request, he would have advised them, as he did Mr. Birdo, that an MRI was not medically necessary. (Exhibit A.)
105. Dr. Brown's entries in Mr. Birdo's medical records reflect his opinion that an MRI was

not necessary at any time following Mr. Birdo's fracture of his arm in October of 2004. (Exhibit A.)
106. Mr. Birdo engaged in another hunger strike for a week or more relating to some non-medical issue on June 5, 2005. During that time, Mr. Birdo refused to be evaluated by Dr. Brown (Exhibit A.).
107. The next time Dr. Brown saw Mr. Birdo for complaints relating to his shoulder was August 28, 2006. At that time, Mr. Birdo was brought to the healthcare unit by three (3) guards who had him cuffed behind. Birdo complained that his shoulders were traumatized or dislocated. On examination, Dr. Brown found Mr. Birdo to be a very muscular man who winced and pulled away if Dr. Brown so much as touched his shoulders. Mr. Birdo was yelling about how mistreated he had been during his apprehension. Dr. Brown assessed Mr. Birdo as having feigned his shoulder pain at that time. No particular treatment was required. (Exhibits A and A-29.)
108. In Dr. Brown's medical opinion, the clinical presentation was not consistent with the patient's complaints. (Exhibit A.)
109. The next time Dr. Brown references Mr. Birdo's shoulder is on September 13, 2006. At that time, Mr. Birdo made complaints of urinary problems. Dr. Brown noted at that time that Mr. Birdo's shoulders were now asymptomatic. He was at that time complaining of tender and painful testicles. (Exhibits A and A-30.)
110. It should also be noted that between the times Dr. Brown saw Mr. Birdo for his complaints of shoulder pain, he was being seen for other complaints and had engaged in other hunger strikes relating to matters other than his shoulder. (Exhibit A.)
111. On other occasions Mr. Birdo had engaged in a hunger strike, he was found to be obtaining food from an outside source. (Exhibit A.)
112. Dr. Brown's last note for the medical records received was dated September 20, 2006. (Exhibits A and A-31.) This note makes no reference to complaints regarding Mr. Birdo's shoulders. (Exhibit A.)
113. With respect to the referral made to outside medical providers, see the attached Group Exhibit A-32.
114. Each of these documents reflects a referral request or furlough completed by either Dr, Brown or the Healthcare Unit Administrator for Mr. Birdo to be seen by an outside specialist. Group Exhibit A-32 contains the documentation which reflects that the appointment made for Dr. Morton's office on October 14, 2004 was canceled pursuant to Dr. Morton's office and not pursuant to any request made by an employee of the Department of Corrections or by Dr. Brown, Dr. Funk, Susan Moore, or Nurse Shaw.
115. The remaining documents reference referral requests for Mr. Birdo to be seen by Dr. Morton, Dr. Olson, or someone at the Quincy Medical Group in either Quincy, Illinois or Mt. Sterling, Illinois. (Exhibits A and Group Exhibit A-32.)
116. These records reflect that all requests for referrals were approved as accompanying each request is a furlough signed by the Healthcare Unit Administrator for the date of each visit. (Exhibits A and Group Exhibit A-32.)
117. In Dr. Brown's opinion, Mr. Birdo's fractured arm was treated appropriately. (Exhibit A.)
118. In fact, Mr. Birdo was transferred to an outside facility on the day his arm was fractured.

The recommendations regarding treatment for Mr. Birdo's arm were followed on that date.  (Exhibit A.)
119. Mr. Birdo's left arm was placed in an immobilizer on October 12, 2004 by staff at the Blessing Hospital in Quincy, Illinois.  (Exhibit A.)
120. The time period between the date Mr. Birdo was originally seen at Blessing Hospital and his follow-up visit was due to the lack of availability of the immobilizer.  (Exhibit A.)
121. Mr. Birdo was sent back to Dr. Olson for placement of the shoulder brace once it arrived at Dr. Olson's office.  (Exhibit A.)
122. There was no unnecessary delay.  (Exhibit A.)
123. At all times, Dr. Brown believes that his care and treatment of Mr. Birdo was reasonable and within the standard of care.  (Exhibit A.)
124. In Dr. Brown's opinion, the pain medication provided to Mr. Birdo was reasonable and appropriate.  (Exhibit A.)
125. The nursing staff at the Western Illinois Correctional Center may not provide medications to Mr. Birdo that have not been prescribed by Dr. Brown or other staff physicians or the nurse practitioner.  (Exhibit A.)
126. The complaints made against Nurse Moore and Nurse Shaw relating to requests for additional narcotics are unfounded as it appears from the records that they provided Mr. Birdo with the medications that had been prescribed for his use at that particular time.  (Exhibit A.)
127. Nurses are not authorized to prescribe medications or hand out medications that have not been prescribed by a doctor or by the nurse practitioner.  (Exhibit A.)
128. At no time did Dr. Funk interfere with or change Dr. Brown's opinion regarding the course of care he recommended for Mr. Birdo concerning his left shoulder.  (Exhibit A.)
129. In addition, the decisions Dr. Brown made regarding the care and treatment provided to Mr. Birdo concerning his left shoulder were not based upon any Wexford or any other policy.  (Exhibit A.)
130. Dr. Brown's recommendations for care were based upon his medical judgment, expertise, medical education, and experience.  In addition, Dr. Brown relied upon Mr. Birdo's presentation and his actions in the course of Dr. Brown's clinical evaluation of him when determining the best appropriate course of action for his care, as well as upon the diagnostic findings of the radiology reports and the evaluations of the outside orthopedic physicians.  (Exhibit A.)
131. With respect to October 20 and October 21, 2004, there were no orders for Vicodin or similar narcotics in place.  Accordingly, neither Nurse Moore, Nurse Shaw, nor any other nurse had authority to provide Mr. Birdo with such medication on that date.  (Exhibit A.)
132. According to the medical records, Dr. Tariq prescribed Vicodin on October 15, 2004 for three (3) days.  (Exhibits A and A-33.)
133. On October 18, 2004, Dr. Brown noted the Vicodin prescription ended and prescribed Tylenol for Mr. Birdo's continued complaints of pain.  (Exhibits A and A-33.)
134. On October 19, 2004, Dr. Brown modified the prescription to 800 mg of Motrin every eight (8) hours for one (1) week as needed.  (Exhibits A and A-33.)
135. It should be noted that Dr. Brown played no role in treating Mr. Birdo until October 18, 2004.  (Exhibit A.)

136. In addition, there were no ill effects resulting from the wait in obtaining the shoulder brace as Mr. Birdo's fracture healed very nicely, as is documented by the X-ray reports. (Exhibit A.)
137. Contrary to Mr. Birdo's statements, there are no X-rays which would suggest that Mr. Birdo suffers from a malaligned fracture. (Exhibit A.)
138. Mr. Birdo was advised that he was to participate in any activities he felt comfortable doing. He was shown exercises to strengthen his arms. (Exhibit A.)
139. As of the last time Dr. Brown saw Mr. Birdo, his arms appeared to be quite muscular on both the left and right sides. (Exhibit A.)
140. As of the last time Dr. Brown saw Mr. Birdo, he did not believe that Mr. Birdo suffered from a serious medical condition relating to his left shoulder. (Exhibit A.)
141. Subsequent to October 12, 2004, Dr. Funk provided no direct medical treatment to Kevin Birdo. (Exhibit B.)
142. In the course of Dr. Funk's tenure as the Regional Medical Director, he does not have a specific recollection of reviewing or participating in the care and treatment of Kevin Birdo. (Exhibit B.)
143. Nevertheless, according to an entry made by Dr. Lowell Brown on October 19, 2004, his notes suggests that Dr. Funk approved a visit to an outside orthopedic physician. (Exhibit B and Exhibit A-11.)
144. Although Dr. Funk has no recollection of this, he would agree that such a visit was appropriate following the fracture of Mr. Birdo's arm and based upon recommendations of the orthopod who saw Mr. Birdo at the Blessing Hospital emergency room on October 12, 2004. (Exhibit B and Group Exhibit B-1, pp. 12-13.)
145. Dr. Funk played no role in scheduling the specific appointment dates for Mr. Birdo. (Exhibit B.)
146. At no time did Dr. Funk deny any requests for follow-up care, nor was he consulted about the appropriate care and treatment of Mr. Birdo's left humerus fracture by any of the outside orthopedic physicians, including Drs. Morton and Olson. (Exhibit B.)
147. Dr. Funk's role on June 19 would have been limited to approving the request for a follow-up visit with the orthopedic physician at Blessing Hospital. (Exhibit B.)
148. Dr. Funk did not evaluate Mr. Birdo personally at any time following October 12, 2004. (Exhibit B.)
149. Dr. Funk is aware from reviewing portions of Mr. Birdo's medical records that Dr. Brown's personal entry of January 11, 2005 suggests that he planned to discuss Mr. Birdo with "Dr. F." (Exhibits B and B-2.)
150. Dr. Funk would assume that "Dr. F" refers to Dr. Funk. However, he does not recall having a conversation with Dr. Brown about Mr. Birdo's request for an MRI. (Exhibit B.)
151. Dr. Funk has no written documentation that a request for a referral for an MRI was ever made to him. (Exhibit B.)
152. In reviewing the medical records contained within Group Exhibit B-1, pp. 4-5, it appears that Dr. Olson, the orthopedic physician at Quincy Medical Group who had been treating Mr. Birdo, came to the conclusion that an MRI would not change the outcome of Mr. Birdo's condition and the results of the MRI would not change the course of treatment.

(Exhibit B.)
153. Based upon his review of Group Exhibit B-1, pp. 4-5, Dr. Funk would agree that an MRI was not medically necessary.  (Exhibit B.)
154. In reviewing Mr. Birdo's medical records generated at the Western Illinois Correctional Center, it appears to Dr. Funk that the Western Illinois Correctional Center received Dr. Olson's written report on January 24, 2005.  (Exhibits B and B-3.)
155. It also appears that Dr. Brown reviewed this document on January 25, 2005.  (Exhibits B and B-2.)
156. Subsequent to that date, Dr. Funk finds no documentation of Dr. Brown contacting him to discuss the need for an MRI. It is Dr. Funk's understanding that Dr. Brown did not recommend an MRI for Mr. Birdo. Based upon Dr. Funk's review of Dr. Olson's report dated January 11, 2005, he would agree with Dr. Brown's assessment that an MRI was not medically necessary.  (Exhibit B.)
157. Other than the minimal contacts Dr. Funk may have had with Dr. Brown in this case, he had no direct involvement in providing care and treatment to Mr. Birdo. Dr. Funk made no decisions concerning whether or not Mr. Birod should receive any particular course of treatment.  (Exhibit B.)
158. Dr. Funk did not interfere with any course of care prescribed by Dr. Brown or anyone else.  He is not aware of any denials or refusals of care made by him in this case. (Exhibit B.)
159. In the course of her employment as a nurse at that facility, Connie Shaw saw an inmate by the name of Kevin Birdo.  (Exhibit C.)
160. From reviewing the medical records, it appears the first entry Nurse Shaw made after October 12, 2004 in Mr. Birdo's medical records was on October 20, 2004. (Exhibits C and C-1.)
161. On that date, Nurse Shaw made an entry at 8 a.m. as follows:
    Argues about meds - hateful - loud.
    S (subjective)/O (objective): Refused Tylenol-when handed to him fingers warm - refuses to let me do good check of arm. Wants stronger pain meds.
    A (assessment): Fractured humerus.
    P (plan): Continue as ordered. (Exhibits C and C-1.)
162. On October 20, 2004, Nurse Shaw saw Mr. Birdo while he was in the infirmary.  He argued with her about his medications and was hateful and loud, per her note.  He refused his medication and refused to allow her to do a good examination of his arm.  (Exhibit C.)
163. At that time, there was an order in place for Tylenol, which Nurse Shaw attempted to provide to Mr. Birdo. Mr. Birdo refused this.  (Exhibit C and Exhibits A-33 and A-34.)
164. In the course of her employment as a nurse, Nurse Shaw did not have authority to alter a medication order without approval from a physician or on occasion, the nurse practitioner.  (Exhibit C.)
165. On this particular date, Dr. Brown also saw the patient at approximately 8 a.m. after Nurse Shaw had seen him. No changes were made in the plan for Mr. Birdo by Dr. Brown.  (Exhibits C and C-2.)
166. Nurse Shaw personally noted Dr. Brown's orders of that date and time.  (Exhibits C and

C-2.)
167. Subsequent to that date, there are brief references to Nurse Shaw's name in Mr. Birdo's medical chart, including her signature on the transfer status summary dated November 8, 2004. (Exhibits C and C-3.) At no time did Nurse Shaw play any role in determining the specific medication that should or should not be provided to Mr. Birdo. (Exhibit C.)
168. Nurse Shaw followed the orders as she found them in Mr. Birdo's medical chart as written by the Medical Director or other staff physician. (Exhibit C.)
169. As a nurse at the Western Illinois Correctional Center, Nurse Shaw must follow the prescription orders written by either the staff physicians or by the Medical Director, Dr. Brown at that time. (Exhibit C.)
170. Nurses, in general, may not provide medications to inmates based upon recommendations or suggestions for medications, diagnostic tests, or any other sort of recommended plan of care that has not been agreed to or adopted by an onsite physician and entered into the patient's chart. (Exhibit C.)
171. Nurse Shaw played no role in determining the time frame for which Mr. Birdo was to see his outside physicians regarding his fractured arm. (Exhibit C.)
172. Nurse Shaw believes the care she provided to Mr. Birdo was reasonable and within the standard of nursing care. (Exhibit C.)
173. In the course of her employment as a licensed practical nurse, Nurse Susan Moore has seen an inmate by the name of Kevin Birdo, according to his medical records. (Exhibit D.)
174. Subsequent to October 12, 2004, it appears that Nurse Moore first saw Mr. Birdo on October 21, 2004 at 9 a.m. Her note from that date reads as follows:
> S (subjective): Up and about cell, very angry. Complaining of severe pain in arm. Rates 5 on a 5 scale. States "I can feel the bones moving."
> O (objective): Sling and splint intact. Is able to move fingers without difficulty.
> A (assessment): Humerus fracture.
> P (plan): Continue with Advil and Tylenol as ordered. Will advise M.D. of complaints of pain. Note per medical records is scheduled for above furlough October 22. (Exhibit D and Exhibit C-2.)

175. On October 21, 2004, Nurse Moore spoke with Kevin Birdo regarding his arm fracture. At that time, he was housed in the infirmary for observation. Nurse Moore reviewed Dr. Brown's note of October 20, 2004 (this note for Susan Moore is the same as Exhibit C-2) (Exhibit D.)
176. Dr. Brown's note indicates that the patient was to be seen by Dr. Morton for a definitive splint. Nurse Moore noted this was to be scheduled for October 22, the next day. (Exhibit D.)
177. Mr. Birdo was upset and was complaining of pain. (Exhibit D.)
178. As an LPN, Nurse Moore has no authority to alter the medication prescriptions that have been ordered by a physician. As she is required to do, Nurse Moore noted the patient's complaints and advised the physician of those complaints. (Exhibit D.)
179. In addition, Nurse Moore completed the Health Status Transfer Summary Sheet (Exhibits D and D-1), a part of the required paperwork necessary to allow Mr. Birdo to be released

for a medical furlough.  (Exhibit D.)
180. His prescription order at that time was Motrin 800 mg every eight (8) hours, as well as Tylenol 650 mg every six (6) hours.  (Exhibits D and D-1; see also Exhibits A-33 and A-34.)
181. Dr. Brown made an entry on October 21, 2004 indicating and acknowledging Nurse Moore's reports to him. Nurse Moore noted Dr. Brown's entry myself at 10:30 a.m. (Exhibits D and D-2.)
182. At 11:30 a.m., Nurse Moore made another entry regarding Mr. Birdo's complaints.  Her lengthy note reads as follows:
> S (subjective): Inmate asked to see crisis team member.
> O (objective): Inmate angry, pacing floor. No eye contact, yelling, demanding to see psych.  He was advised psych (psychiatrist) is not on campus today.  He refused to see this nurse or any other healthcare staff stating, "You're the ones I have a problem with, and I don't want to see any DOC employees." He stated "I'm depressed and I'm having bad thoughts."  When asked what kind of thoughts, he stated "You're not going to trap me with that question.  I'm not going to the naked room." Inmate continued to get louder and more angry/aggressive.  Is furious about his arm.  "It's been 12 days and I feel bones moving." States "I want a warmer cell and no one has told me how to bathe."  This nurse offered to assist with his bathing, but he refused stating,  "You people are the ones discriminating against me.  I want to see psych."
> A (assessment): Inmate requesting psych. No psych professional available.  Also refused medical evaluation.
> P (plan): Discuss with DON (Director of Nursing) Blaesing and notify clinical service to send a counselor to see him.  Spoke with Counselor S. Bell.  She advised this nurse that P. Vincent is Inmate Birdo's counselor.  She will notify him "but he's at lunch." (Exhibits D and D-2, pp. 1-3.)
183. Nurse Moore is not a psychologist.  (Exhibit D.)
184. Nurse Moore has no training in evaluating psychiatric conditions.  (Exhibit D.)
185. Nurse Moore noted Mr. Birdo's requests and appropriately referred them to her supervisor, the Director of Nursing, Jennifer Blaesing.  (Exhibit D.)
186. Nurse Moore also notified clinical services to send a counselor to see Mr. Birdo. (Exhibit D.)
187. Mr. Birdo refused to see Nurse Moore and did not want to see any other healthcare staff. (Exhibit D.)
188. Mr. Birdo's records reflect that his counselor was there to see him by 12:30 p.m. (Exhibits D and D-3.)
189. This document also reflects that Nurse Moore completed the Health Status form by 3:08 p.m. on that date. (Exhibits D and D-3.)
190. Nurse Moore had no role in determining the specific dates upon which Mr. Birdo was to be sent out to see any outside physician. (Exhibit D.)
191. Nurse Moore is not qualified to make a decision as to whether or not Mr. Birdo should be seen by an outside physician. (Exhibit D.)
192. Nurse Moore is not qualified to prescribe narcotic medications nor to alter prescriptions

15

which have been written by a physician. (Exhibit D.)
193. In the course of her employment as a nurse at the Western Illinois Correctional Center, Nurse Moore may only administer those medications which have been properly prescribed by the Medical Director, staff physicians, and at times, the nurse practitioner or the physician's assistant. (Exhibit D.)
194. On October 21, 2004, Nurse Moore was authorized only to provide Mr. Birdo with those medications that had been prescribed by Dr. Brown, which included ibuprofen and Tylenol. (Exhibit D.)
195. Nurse Moore believes her course of care was appropriate and within the standard of care for nursing practice. (Exhibit D.)
196. Nurse Moore advised all appropriate individuals of the complaints made by Mr. Birdo so that his complaints could be properly assessed and channeled to the appropriate individuals. (Exhibit D.)
197. At the time of these events, Defendant Polk was the Warden of Western Illinois Correctional Center. (Plaintiff's Dep. at pp. 53-54; Affidavit of Terry Polk ("Polk Affidavit"), attached hereto as Exhibit C).
198. Plaintiff also alleges that Defendant Polk ignored his complaints and did not respond to his letters. (Plaintiff's Dep. at p. 57).
199. Defendant Jackie Miller and Defendant Gary Drawve are members of the Administrative Review Board. (Plaintiff's Dep. at pp. 57-58)
200. Plaintiff alleges that Defendants Drawve and Miller were deliberately indifferent to his serious medical needs in that they failed to take any action regarding Plaintiff's grievances about the medical treatment he was receiving for his left arm. (Plaintiff's Dep. at p. 57).
201. Plaintiff testified that Defendants Drawve and Miller responded to all of Plaintiff's grievances by denying them. (Plaintiff's Dep. at p. 58).
202. Plaintiff alleges that Defendants Drawve and Miller stood idly by and condoned the deprivation of his constitutional rights when they failed to contact the agency medical director about the grievances he submitted. (Plaintiff's Dep. at pp. 58-59).
203. Defendant Sue Redshaw was the grievance officer who handled Plaintiff's grievances about his fractured arm. (Plaintiff's Dep. at p. 59).
204. Defendant Redshaw responded to all of Plaintiff's grievances by recommending that they be denied. (Plaintiff's Dep. at p. 59).
205. Plaintiff alleges that Defendant Redshaw was deliberately indifferent to his serious medical needs because she had the authority to ensure that he receive prompt and effective medical treatment but did not do so. (Plaintiff's Dep. at p. 59).
206. Plaintiff alleges that Defendant Redshaw participated in the deprivation of his constitutional rights when she failed to consult medical books, the agency medical director, or a neutral specialist regarding his grievances. (Plaintiff's Dep. at p. 60).
207. Defendants Drawve, Miller, Walker, and Zimmerman played no role in the scheduling of outside medical appointments or the medical furlough process in October of 2004. (Affidavit of Gary Drawve ("Drawve Affidavit") attached hereto as Exhibit D; Affidavit of Jackie Miller ("Miller Affidavit") attached hereto as exhibit E; Affidavit of Sue Redshaw ("Redshaw Affidavit") attached hereto as Exhibit F; Polk Affidavit).

208. Defendant Polk's only involvement in the medical furlough process was ensuring that there was a written procedure in place. (Defendant Polk's Response to Interrogatory #2, served April 23, 2007, attached hereto as Exhibit G).
209. Plaintiff's physicians determined that an MRI was not medically necessary. Accordingly, none of Plaintiff's doctors ever ordered an MRI. (Affidavit of Dr. Brown, ("Brown Affidavit") attached to Defendant Brown's Motion for Summary Judgment as Exhibit A).
210. Defendants Drawve, Miller, Redshaw, Polk and Walker are not physicians, and are not trained or qualified to prescribe pain medication, an MRI, or to provide patient education in relation to fractured bones. (Plaintiff's Dep. at p.64; Drawve Affidavit; Miller Affidavit; Redshaw Affidavit; Polk Affidavit).
211. Defendant Walker is the Director of the Illinois Department of Corrections. (Affidavit of Terri Anderson ("Anderson Affidavit"), attached as Exhibit B [111].
212. Plaintiff alleges that Defendant Roger E. Walker learned of his fractured arm through the grievance procedure. (Plaintiff's Dep. at p. 53 [111].
213. Defendant Walker routinely delegates his authority to review grievances to designees. (Anderson Affidavit).
214. The purported signatures of Roger E. Walker on the Administrative Review Correspondences attached to Plaintiff's Complaint as exhibits were made by Terri Anderson, Roger E. Walker's designee, not by Roger E. Walker personally. (Anderson Affidavit).
215. Plaintiff testified that he has never personally spoken to Defendant Walker about his broken arm. (Plaintiff's Dep. at p. 53).

**Conclusion**

Deliberate indifference to a serious medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976). The need must be objectively serious, *and* the official must personally know of the risk and consciously disregard it. *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999); *Mathis v. Fairman*, 120 F.3d 88. 91 (7th Cir. 1997); *Wynn v. Southward*, 251 F.3d at 593 (2001). An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment . . ." *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373. The subjective component of deliberate indifference does not encompass negligence or even gross negligence. *Id.*, *citing Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991); *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The prisoner must "show that the prison official was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety."

*Wynn*, 251 F.3d at 593, *citing Farmer v. Brennan*, 511 U.S. at 837; *Zentmyer*, 220 F.3d at 811. A prisoner is not required to show that he was "literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). Deliberate indifference may also be inferred "when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996); *see also Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances."). However, malpractice or disagreement with a doctor's treatment decisions cannot be the basis for an Eighth Amendment challenge. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). A prison doctor's decision not to follow an outside specialist's recommendations may, however, raise an inference of deliberate indifference. *Gil v. Reed*, 381 F.3d 649, 663-64 (7th Cir. 2004).

In his response at pp 2-3 [147], the plaintiff advises the court that his claim is that the period of time from October 12, 2004, when he broke his arm, until October 22, 2004, when his arm was set, was an unnecessary delay that constituted deliberate indifference to his serious medical needs.

Even if there had been a delay, the plaintiff has not provided verifying medical evidence that establishes any detrimental effect of delay in medical treatment. "'An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed.'"*See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996)(emphasis in *Langston*)). It is apparent from the detailed statements of facts concerning the treatment the plaintiff received for his broken arm that the medically trained defendants were not deliberately indifferent to his obviously serious medical need. The plaintiff was taken to the prison health care unit and examined immediately after his injury. The broken arm was diagnosed and the plaintiff was taken to a hospital and put in the care of an orthopedist within three hours after his injury. The defendants did not ignore the plaintiff's condition but moved to treat it. Nothing indicates the defendants failed to follow the recommendations for treatment and medication of the consulting orthopedists. There was a medical reason for changing the pain relievers he was prescribed and the change was in agreement with what was prescribed by the orthopedists. An MRI of the plaintiff's shoulder was something he demanded, not something the orthopedists or the prison doctors thought was medically indicated. His claims of need for physical therapy are not substantiated by his medical records. The medical records point rather to malingering on Birdo's part and that when the doctors did examine him, it appeared he had recovered from his injury and his muscular structure appeared normal.

The same may be said about the corrections personnel defendants who were not medically trained. In *Johnson v. Doughty,* 433 F.3d 934, fn9 (7th Cir. 2001) the court observed:

The Third Circuit's analysis on this point bears repeating here:

18

> If a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.... Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

*Spruill v. Gills*, 372 F.3d 218, 236 (3rd Cir. 2004) ; *see also Greeno v. Daley,* 414 F.3d 645, 656 (7th Cir. 2005).

Here the defendants, Gary Drawve, Jackie Miller, Terry Polk, Sue Redshaw, Deborah Fuqua, and Roger E. Walker, Jr., were not medically trained and were relying on the medical personnel in whose hands Birdo had been placed for care.  Non-medical prison officials are not generally chargeable with deliberate indifference because they must rely on those with medical expertise to assess the needs of inmates and to prescribe treatment. *See Johnson v. Doughty*, 433 F.3d 1001, 1011 n.9 (7th Cir. 2006).  These defendants are not doctors, and are not trained or qualified to prescribe the plaintiff painkillers, an MRI, or to provide patient education for a fractured arm.  Plaintiff was receiving treatment from his physician, Dr. Brown, and two orthopaedic specialists, Dr. Morton and Dr. Olson.  As such, these defendants had to rely on the physicians to prescribe medication, select the appropriate course of treatment, and to provide patient education where necessary.  The facts are overwhelming that these defendants were not in a position to gainsay the judgment of the medical defendants and reasonably relied upon that judgment.  These defendants lack the requisite personal involvement for liability under 42 U.S.C. §1983.  Liability under §1983 requires a plaintiff to show direct, personal responsibility on the defendants' part for those acts and omissions claimed to have deprived the plaintiff of his rights. *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).  Supervisory officials will not be found liable under the doctrine of respondeat superior. *Duckworth v. Franzen*, 780 F.2d 645, 650 (7th Cir. 1985).  In order to be held liable under §1983, a supervisor must have "had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *J.H. and J.D. v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003).   A supervisor who is merely negligent in failing to detect and prevent other employees' conduct will not be liable under §1983. *Jones v. Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).  Personal involvement cannot be established simply by alleging that a defendant was notified by letter of an alleged Constitutional violation. *Volk v. Coler*, 638 F.Supp. 1540, 1548, aff'd 845 F.2d 1422 (7th Cir. 1988).  Defendant Walker never received notice of the alleged Constitutional violations.

It is therefore ordered:

1. The defendants' motions for summary judgment are granted [109], [110] and [135]. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff. Any remaining matters are rendered moot, and this case is terminated, with the parties to bear their own costs.

2. If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

Enter this 27th day of March 2008.

                **s\Harold A. Baker**
                _____
                Harold A. Baker
                United States District Judge